Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

United States Courts
Southern District of Texas
FILED

MAY − 1 2023   DJM

Nathan Ochsner, Clerk
Laredo Division

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

Laredo Division

| | |
|---|---|
| Kristal Que Lansford, Pro Per | ) Case No. **5:23- CV-45** |
| | ) *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | ) |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) Jury Trial: *(check one)* ☑ Yes ☐ No |
| -v- | ) |
| Laredo College, Dr. Marisela Rodriguez-Tijerina, Jackie Leven-Ramos, Rusty Muerer LLC | ) |
| *Defendant(s)* | ) |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) |

## COMPLAINT FOR A CIVIL CASE

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Kristal Que Lansford |
| Street Address | 116 Phoenix Palm Drive |
| City and County | Laredo, Webb |
| State and Zip Code | Texas, 78045 |
| Telephone Number | 415-517-2420 |
| E-mail Address | Klansford36@gmail.com |

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Page 1 of 5

Defendant No. 1

| | |
|---|---|
| Name | Laredo College |
| Job or Title *(if known)* | |
| Street Address | West End Washington Street |
| City and County | Laredo, Webb |
| State and Zip Code | Texas, 78040 |
| Telephone Number | 956-722-5138 - Human Resources |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | Dr. Marisela Rodriguez-Tijerina |
| Job or Title *(if known)* | Provost (Former Interim President) |
| Street Address | West End Washington Street - Elpha Lee West Bldg., Room 124 |
| City and County | Laredo, Webb |
| State and Zip Code | Texas, 78040 |
| Telephone Number | 956-721-5820 |
| E-mail Address *(if known)* | marisela.rodriguez@laredo.edu |

Defendant No. 3

| | |
|---|---|
| Name | Jackie Leven-Ramos |
| Job or Title *(if known)* | Laredo College Board of Trustees Member |
| Street Address | 97 Grove Ave |
| City and County | Laredo/Webb |
| State and Zip Code | Texas, 78045 |
| Telephone Number | 956-744-2336 |
| E-mail Address *(if known)* | jackie.ramos@laredo.edu |

Defendant No. 4

| | |
|---|---|
| Name | George Russell Meurer |
| Job or Title *(if known)* | |
| Street Address | 211 Calle del Norte Rd., Suite 100 |
| City and County | Laredo, Webb |
| State and Zip Code | Texas, 78041 |
| Telephone Number | 956-712-1600 |
| E-mail Address *(if known)* | grmeurer@kmp-law.com |

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question                    ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

42 U.S. Code § 1983 - right to sue state government employees and others acting "under color of state law" for civil rights violations and deprivation of rights (1st and 14th Amendment, protected activity, protected class); Title IX/Title VII- Discrimination on the basis of sex, retaliation, disparate impact, failure to follow policies (Title IX due process), false/pre-textual explanations, lack of documentation, bolstering after the fact, inconsistent treatment, suspicious timing, discriminatory employment policy, abuse of process, and investigator conflict of interest and bias.    ⊞

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)*  Kristal Que Lansford                    , is a citizen of the State of *(name)*  Texas                    .

b.    If the plaintiff is a corporation

The plaintiff, *(name)*                     , is incorporated under the laws of the State of *(name)*                    ,

and has its principal place of business in the State of *(name)*                    .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)*  Dr. Marisela Rodriguez-Tijerina        , is a citizen of the State of *(name)*  Texas                    . Or is a citizen of *(foreign nation)*                    .

b.   If the defendant is a corporation

The defendant, *(name)* Laredo College                , is incorporated under

the laws of the State of *(name)*    Texas                , and has its

principal place of business in the State of *(name)*   Texas

Or is incorporated under the laws of *(foreign nation)*

and has its principal place of business in *(name)*

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.   The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

Monetary liability and punitive damages judgment against named defendants and et .al, defendants to the extent of their liability. Plaintiff suffered total loss of career opportunities, loss of income, and emotional pain and anguish. Plaintiff further requests the court to appoint legal counsel as needed because part-time income combined with meager unemployment still leaves her at the poverty index level. Costs for loss and remuneration for legal representation have not been determined. Estimated damages will exceed one million U.S. dollars.

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

See Attached

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

As a result of the acts of Defendants, Plaintiff has been injured and damaged as follows: She has suffered emotional trauma and humiliation; she has suffered mental pain and anguish; she has incurred expenses in an attempt to enforce her legal rights; she has suffered loss of income; she has been offended by Defendants' discriminatory actions; she was denied the benefit of working in an environment in which people of both genders are treated equally; she has suffered mental pain and anguish; she has incurred expenses in an attempt to enforce her legal rights; she has suffered loss of income; she has been offended by Defendants' retaliatory and discriminatory actions; she was demoted and her salary was reduced, she was denied earned pay raises and benefits, and she was  transferred to a less prestigious position, ultimately terminated, her career interrupted, her

coaching career ended 10 years prematurely, and she has been otherwise discriminated against in the terms and conditions of her employment; she has been denied the opportunity to advance in her career and she has suffered corresponding economic damages; she was forced to work in an environment hostile to strong females, one in which harassment based on biased gender stereotypes, was directed toward her; all in violation of her federally protected rights; and she has been otherwise injured and damaged. all in violation of his federally protected rights; and he has been otherwise injured and damaged.

Plaintiff prays upon the court for a monetary liability and punitive damages judgment against named defendants and et .al, defendants to the extent of their liability. Plaintiff suffered total loss of career opportunities, loss of income, and emotional pain and anguish. Plaintiff further requests the court to appoint legal counsel as needed because part-time income combined with meager unemployment still leaves her at the poverty index level. Costs for loss and remuneration for legal representation have not been determined. Estimated damages will exceed one million U.S. dollars.

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:            05/08/2023    05/01/2023

Signature of Plaintiff

Printed Name of Plaintiff    KRISTAL QUE LAPSFORD

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

This is an action for legal and equitable relief to redress unlawful discrimination in employment on the basis of race, color, sex, gender and national origin in violation of 42 U.S.C. 2000e et seg, as amended, (Title VII), 42 U.S.C. §2000d et seq. (Title VI), 42 U.S.C. § 1981, 1981a and 42 U.S.C. § 1983, 1985, 1986 and 1988; in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et.seg., to redress retaliation taken against Plaintiff for his opposition to discriminatory practices and for filing an EEOC charge; to redress the denial under color of law, of freedom of speech and petition pursuant to the First and Fourteenth Amendments and the equal protection of the law pursuant to the Fourteenth Amendment of the United States Constitution; to redress the harms imposed in violation of state contract and tort law; and to redress the deprivation of Plaintiffs' rights, privileges, and immunities protected by the Constitution.

1. The acts complained of herein relate to Plaintiff's place of employment in Webb County, Texas, within the Southern District of Texas.
2. Prior to filing this civil action, Plaintiff timely filed a written charge with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the last discriminatory act asserting discrimination and retaliation and received the EEOC Notice of Right-to-Sue on 1/30/23.
3. Plaintiff has exhausted all conditions precedent to suit.

PARTIES

4. Plaintiff, Kristal Que Lansford, Pro Per (hereinafter referred to as "Plaintiff," "Miss Lansford," or "Coach Lansford") is a 57-year-old female, an aggrieved person, and a person discriminated against and an employee within the meaning of Title VII of the Civil Rights act of 1964. Plaintiff resides in Webb County, Texas, and at all times has been a United States citizen.
5. Defendant, Laredo College (hereinafter referred to as "LC" or "the College"), is an entity subject to suit under Title VII of the "Civil Rights Act of 1964", as amended, 42 U.S.C. § 2000e et sec., and 42 U.S.C. § 1981,1981(a), 1983 and state contract and tort law. The defendant employs at least fifteen (15) persons and constitutes an employer within the meaning of 42 U.S.C. § 2000e (b), (g), & (h). LC operates an educational program or activity and is the recipient of federal financial assistance.
6. Defendant, Dr. Marisela Rodriguez-Tijerina, in her official capacity, is the Provost/ Vice President of Academic Affairs and the former Interim President at the College, a state entity, at relevant times had the ultimate authority over the operations and policies of the University, and as such, is subject to suit under Title VII of the "Civil Rights Act of 1964", as amended, 42 U.S.C. § 2000e et.-seg., and 42 U.S.C. § 1981, 1981(a), 1983, and state contract and tort law. The defendant is a Hispanic female over 21 years of age and employed in the Southern District of Texas.
7. Defendant, Jackie Leven-Ramos, in her official capacity, is a Board of Trustees member, Board Secretary, and Chair of the ad hoc committee for athletics comprised in March 2021 of Laredo College, a state entity, has the ultimate authority over the operations, and policies of

as amended, 42 U.S.C. § 2000e et.-seg., and 42 U.S.C. § 1981, 1981(a), 1983, and state contract and tort law. The defendant is a Hispanic female over 21 years of age and an elected official in the Southern District of Texas.

8. Defendant, George Russell Meurer (Kazen, Meurer & Perez, LLP), in his official capacity, is legal counsel for Laredo College and served as the investigator in the Plaintiff's Title IX grievance investigations for Laredo College, a state entity, has the ultimate authority over the operations, and policies of the University, and as such, is subject to suit under Title VII of the "Civil Rights Act of 1964", as amended, 42 U.S.C. § 2000e et.-seg., and 42 U.S.C. § 1981, 1981(a), 1983, and state contract and tort law. The defendant is a Hispanic male over 21 years of age and an elected official in the Southern District of Texas.

9. Et.al Defendants A-Z are those officials and employees of the College who participated in or are responsible for discriminating against, retaliating against, and harassing Plaintiff on the basis Of race, color, and sex/gender who negligently retained or supervised those who did or otherwise impinged upon Plaintiff's federally protected rights, and/or conspired and/or agreed to do the same, on the basis of race, color, national origin, and sex, and/or who neglected or failed to prevent the wrongful actions of the conspirators. They are over 21 years of age and are sued in their individual and official capacities.

10. Kristal Q. Lansford ("Plaintiff" or "Ms. Lansford" is a female U.S. Citizen and a tribal member of the Muskogee Creek Nation born on November 20, 1965. She is perceived by her colleagues as white and Caucasian.

11. Ms. Lansford has an MS in Kinesiology from Texas A&M University, Kingsville, an MA in Education, a BS in Physical Education, a BA in Communications from California State University, Bakersfield, and AA in General Education from Porterville College. Ms. Lansford has over 25 years of experience in her field as a collegiate softball coach at all levels of competition, excluding NCAA Division III.

12. The LC Board of Trustees voted to add Softball and Men's Soccer as varsity sports in 2013 after in-depth research and with overwhelming community support. Both sports were to be the only sports funded through the Student Activities Budget (student fees).

13. The college hired Coach Lansford in February 2014 as the first Head Softball Coach in the newly added women's sport.

14. At the time of hire, Ms. Lansford was the only female head coach in the athletic department. At the time, the head coaches of the other two women's teams (volleyball and tennis) and the three men's teams (baseball, tennis, and soccer) were male. Laredo College has a demonstrated history of employing male head coaches for both men's and women's teams.

15. Laredo College serves a predominately Hispanic community and Ms. Lansford was one of a very small number of "perceived" Caucasian employees.

16. Coach Lansford performed beyond expectations according to her 2014-2021 performance reviews, program development, program progression, community service, recruitment of local student-athletes, and matriculation of student-athletes to the four-year level.

17. At all relevant times, as evidenced by the allegations set forth below, the College was a hostile work environment with regard to gender.

18. Due to her experience at all levels of collegiate athletic competition, Coach Lansford identified some areas of gender inequities within the athletic department and volunteered, on several occasions, to serve as the Title IX Coordinator for the department to evaluate the

history, current status, create a plan to ensure a continuing practice of increasing opportunities for the underrepresented sex (females) and to provide Title IX training opportunities for the athletic department and supervisors outside of athletics (Deans, Department Chairs, etc.) assigned to oversee the athletic department.

19. With the exception of former Athletic Director, Troy Van Brunt, Coach Lansford's research, desire to teach and volunteer offers to oversee fundamental elements of Title IX legislation as it relates to athletics, were ignored by campus administration, peers, supervisors outside of athletics assigned to oversee the department, including the campus Title IX Coordinator, Raquel Pena.

20. When Coach Van Brunt retired in 2020, Ms. Lansford forwarded a PPT presentation she had created for Coach Van Brunt which provided data on the history of Gender Equity at LC, where they were at the time of the research, and where they needed to be. In the email, she offered to meet with him to explain the data. Lansford stated in the email that "although it's probably not important right now, it will be in the future." Coach Lansford never received a response from Dr. Perez and he said that he didn't remember seeing the email or the presentation in an interview during the initial stages of Coach Lansford's first Title IX investigation.

21. Ms. Lansford had a disclosed disability and an ADA for minor accommodations while in her coaching position.

22. Dr. Rodriguez-Tijerina was named Provost of LC in 2018. Prior to her appointment, the coaches and athletic staff had an open and cooperative relationship with former Provost, Dr. Vincent Solis. Immediately following her appointment, we (the coaches) received a message from former athletic director, Troy Van Brunt, that Dr. Rodriguez-Tijerina did not "want the coaches hanging out in the West (Administrative) Building." Unlike her predecessor, Dr. Rodriguez-Tijerina had little, if any, direct interaction with the coaching staff or other members of the athletic department. Dr. Rodriguez's strict adherence to a formal "chain of command" caused a disconnect between the coaches and administration. Because none of the Deans or Department Chairs assigned to oversee athletics had any experience or background in college athletics, communication between the coaches and other members of the athletic department became extremely ineffective.

23. In March 2020 (22 games into the competitive season for softball), classes and athletic practices and competitions were abruptly suspended due to the COVID pandemic.

24. In May 2020, the LC Board of Trustees voted to suspend the Athletics Program for the remainder of the 2019/20 academic year and the following (2020/21) academic year.

25. Prior to the May 2020 board meeting, the coaches received another "grapevine/chain of command" message from the administration that we would be required to sit outside of the building and steer any student-athletes who might protest the decision back to their vehicles. The coaches were also told that if they allowed the student-athletes in the building "their leadership abilities would be severely questioned."

26. While (the coaches) were outside steering potential student-athlete protesters from the building as instructed, Dr. Rodriguez-Tijerina walked out of the building, approached Coach Lansford and Coach Donjuan to ensure them that the administration was going to be 100 percent transparent in the future of and process of reinstating athletics.

27. Immediately following the May 2020 vote to suspend athletics for an additional year, board members and the former college president, Dr. Ricardo Solis, guaranteed employees and the community that the vote to suspend was made solely for safety reasons and, in no manner, the end of LC Athletics.

28. Shortly after the May 2020 meeting, the then-supervisor of the athletic department, Dr. Armando Perez, Chair of Kinesiology initiated a conference call with the three coaches still on staff, Coach Lansford, Jaimie Donjuan, and Juan de Dios Ibarra, and retired athletic director Troy Van Brunt. We were told that they would be "temporarily" reassigned to the newly created Health and Safety Operations Center until it was safe to reinstate athletics and would be required to take a 20% pay cut.

29. In the May 2020 meeting, the Board also voted to suspend the Camillo Prado Child Development Center for an additional year (2020/21), and the majority of Camillo Prado employees were also "temporarily" reassigned to the new Health and Safety Operations Center. These employees, however, retained their current salaries.

30. The transition to HSOC was "chaotic" at best and several employees, including Ms. Lansford, made complaints to Dr. David Arreazola (Interim Provost – Health and Safety Operations) and Human Resources about the HSOC supervisor, Javier Cano. Despite the complaints, no changes were made, and Mr. Cano retained his position as the Director of Health and Safety Operations for the duration of our reassignment.

31. Ms. Lansford's complaints about Mr. Cano were primarily related to the aforementioned ADA which he refused to honor and, on several occasions, laughed at and mocked my disability.

32. Other areas of concern for Ms. Lansford during the transition were that because we were in season when everything abruptly stopped in March 2020 due to the pandemic, projects normally completed at the end of the season with the help of the athletes (uniform, equipment, and apparel return and inventory), shutting down the field (removing, cleaning, and storing backstop padding, cleaning and inventory of the storage sheds) had not been done because the student-athletes and said uniforms, equipment, and other apparel were scattered all over Texas as the was on Spring Break at the time of the 2020 suspension, had the school-owned items with them, and were only allowed on campus at staggered times and dates to collect their belongings from on-campus housing. Ms. Lansford became increasingly frustrated with Mr. Cano for his unwillingness to understand that suspending athletics on May 8th, in no manner, meant that there were nothing left to do in athletics.

33. Ms. Lansford became frustrated with the administration, specifically, Dr. Rodriguez-Tijerina because she would not speak directly to the coaches but requested information from them through Dr. Armando Perez.

34. Consistent with the well-researched inherent gender-based bias female coaches face in the male-dominated profession of college athletics, although Coach Lansford was the only expert in the management of the sport of Softball (the sport, rules, field maintenance, field, and facility specification requirements), it was common for Mr. Cano, Dr. Perez, Coach Van Brunt, and school administrators to bypass Ms. Lansford's input on those issues specific to the sport of Softball and instead seek and follow procedural input and/or advice from the male coaches of other sports.

35. Dr. Rodriguez-Tijerina requested a list of student-athletes who had signed a National Letter of Intent for 2020/21 in an attempt to honor the scholarship of those commitments if the

signed athletes chose to stay at LC during the suspended year. Coach Lansford and Coach Donjuan also provided a list of current student-athletes projected to return whose NLI renewals could not be signed until spring semester grades were released. Dr. Rodriguez-Tijerina, however, did not want that list, nor attempt to understand the timing of their ability to sign prior to the end of the semester. Coach Lansford and Coach Donjuan were told that the administration was only going to honor scholarships for recruits who had already signed NLIs which would only include incoming freshmen or transfers who signed in the November early signing period. Both Coach Donjuan and Coach Lansford were very upset by her decision because, unlike, all other colleges in the same situation, current student-athletes, those whose scholarships should have been honored were hung out to dry.

36. When asked in future meetings and by the media if we (the school) had honored the scholarships of the student-athletes, Dr. Rodriguez-Tijerina always replied "Yes, those who signed an NLI." A reasonable person would assume that "those who signed an NLI" would include current student-athletes who simply had to sign a renewal. Dr. Rodriguez-Tijerina, however, failed to clarify that not one of the scholarships of current-student athletes was honored by the administration.

37. Because the coaches would have to begin recruiting new rosters for the 2021/22 academic year before the November 1st signing period, they began asking when they would be able to start and return to their coaching positions in the fall of 2020. They received no response from the administration and the only "chain of command" we had left regarding athletics was through Dr. Perez who was told that he could no longer talk to them.

38. In the January 2021 employee convocation, Chief Financial Officer, Cesar Vela, mentioned that the budgeting process would begin in early February. Concerned by the lack of communication from the administration and non-existent chain of command, Coach Lansford sent emails to Board members Esteban Rangel and Lupita Zepeda due to our fear that the administration would not include athletics in the 2021/22 budget and then say "We don't have any money" when it became safe to reinstate athletics. Ms. Lansford spoke with both Mr. Rangel and Ms. Zepeda and they both assured her that they would not let that happen.

39. When the budget was introduced to the board in March, however, the administration had not included athletics in the general operating fund budget with supported baseball, volleyball, men's and women's tennis, and the athletic department (the majority of the athletic budget).

40. The administration was asked the same question by the board and community members on several occasions, "Knowing that the suspension was only for one year, why did we not plan for that and where did the money go?" Dr. Rodriguez-Tijerina and Cesar Vela refused to provide a clear answer to that question for several months. They instead diverted the answer to "a balanced budget" at 51 million (reduced from 56 without athletics and the Camillo Prada). They also avoided the question with comments like, "We would have to take money from other programs to put athletics back in the GO." What the administrators didn't tell the board at the time was that the GO was already back at 56 million because they had already spent the money allocated for athletics on new programs. Dr. Rodriguez-Tijerina finally confirmed this to the coaches in February 2022.

41. After the budget conversations, the administration formed an ad hoc committee to make recommendations to the board regarding athletics. Coach Lansford requested to be on the

committee due to her experience and prior involvement in similar situations but was not chosen.

42. The ad hoc committee was chaired by board member, Jackie Ramos and included a total of 4 board members, 1 person from athletics (Coach Donjuan), various campus employees, a student, and some community members.

43. The ad hoc committee met on three occasions to discuss proposals to recommend to the board. The administration provided the committee with a budget of $430,000 from the Student Activities Budget with which to work. Dr. Rodriguez-Tijerina also provided academic, and residency data to the committee from a report she had generated through the Institutional Effectiveness office.

44. In the final ad hoc committee meeting on May 7, 2021, prior to the administration's first act of overt act of discrimination based on sex, the ad hoc committee voted to present three proposals to the board of trustees:

   a) Change revenue allocation from Softball/Men's Soccer to Athletic Program under Student Activities to allow funding for Men's and Women's Tennis.

   b) Reinstate Men's Soccer and Softball and try to add Men's & Women's Tennis dependent on available funds.

   c) Propose a student fee increase of $1-$5 (decided against on advice of the student representative ad hoc committee member).

45. On April 20, 2021, the Board of Trustees voted to reallocate funds from Student Activities Fee for Softball and Men's Soccer to Sports and Wellness (verbiage changed in executive session from ad hoc committee recommendation and agenda item of "Athletics Program").

46. On April 28, 2021, The coaches, including ad hoc committee member Jaime Donjuan, were made aware by Dr. David Arreazola that "they" (still don't know who "they" are) might reinstate Men's Soccer, add Women's Soccer (existing men's sport coach to coach both), and either eliminate or leave all other existing sports in suspension (3 existing women's sports, 2 existing men's sports, 2 coaches of men's sports, and all (3) coaches of women's sports). Ms. Lansford questioned the misdirection of the conversation regarding athletics from pandemic safety concerns to restructuring the athletic department.

47. April 29th AD – Ms. Lansford sent an email to Dr. Arreazola containing a letter she wrote intended for the BOT but decided not to send. The letter addressed promised, but retracted transparency, the reason for initial suspension [safety] in 2020, ad hoc committee discussion stray from safety, and using the guise of the financial impact of COVID to do what some [Dr. Martinez-Tijerina and a few board members] have wanted to do for a long time, eliminate sports.

48. April 29 - BOT voted to reinstate Men's Soccer and add Women's Soccer following the executive session. There was no discussion regarding the proposal nor motion prior to or after the executive session (prompting some of Lansford's Texas Open Meetings Act violations allegations and initial Gender Equity concerns.

49. May 2-4 – Lansford raised her initial Title IX concerns regarding female athletes with Jackie Leven-Ramos (BOT/Ad Hoc Committee Chair, Lupita Zepeda, BOT President [cc by Ms. Leven-Ramos], then LC President, Dr. Ricardo Solis, then Provost/now Interim President, Dr. Marisela Rodriguez-Tijerina, & Title IX Coordinator for Students, Raquel Pena. Ms. Lansford assured all parties that the inequities could be easily resolved internally and offered to

provide support (her experience & LC Athletics Gender Equity Study & Compliance Plan she
created in 2019) in doing so. Lansford offered to help with the simple internal solution,
which she later learned was the ad hoc committee's recommendation, to reinstate Men's
Soccer & Softball.

50. Coach Lansford forwarded the letter she had written to the BOT, but sent only to Dr.
Arreazola on April 29th, to Ms. Leven-Ramos [Lupita Zepeda cc'd].

51. Dr. Martinez-Tijerina responded via email referring Coach Lansford to Raquel Pena (Title IX
Coordinator) and Veronica Cardenas (Director of Human Resources.

52. May 7, 2021 – Coach Lansford received notice and agenda for May 10th (the evening prior to
her scheduled meeting) Special Meeting of the BOT to discuss legal issues pertaining to the
April 29th Men's & Women's Soccer decision.

53. May 10, 2021 – Special BOT meeting to discuss legal issues pertaining to April 29th decision.
Although not on the agenda, Ms. Leven-Ramos provided a PPT presentation that contained
misleading and/or inaccurate information regarding athletics (softball in particular) and was
completely irrelevant to the legality of the April 29th decision.

54. Ms. Lansford assumed that since they had acknowledged possible legal issues with the M &
W Soccer decision, the recommendation and/or motion(s) would be to either reinstate.
Softball in lieu of adding W Soccer or reinstating Softball in conjunction with M & W Soccer.

55. Jackie Leven-Ramos made the motion to move the discussion to proceed executive session.
Her PPT and comments appeared to be specifically aimed at Ms. Lansford in response to
her gender-equity concerns and/or the letter she wrote to the BOT, but only sent to Dr.
Arreazola on April 29th just prior to that BOT meeting. Gender equity was not discussed in
the open portion of the meeting.

56. The motion to rescind the M Soccer/W Soccer decision was made and approved and the
motion to suspend all athletics for 2021-22 was also made and approved. The motion to
suspend all athletics is consistent with future abrupt and reactive changes to BOT agenda
items by Dr. Martinez-Tijerina.

57. Although there was plenty of time and funds for the corrective action, reinstating Softball
would have involved reinstating Coach Lansford's coaching position after she had not only
expressed gender-equity concerns but had also expressed additional concerns with ad hoc
committee discussion direction, transparency of the administration and BOT regarding
COVID, safety, finances, etc. in the letter she wrote on April 29th.

58. Following the executive session, Ms. Leven-Ramos moved to rescind the April 29th decision.
Rather than making an attempt to acknowledge or find an equitable alternative, Ms. Leven-
Ramos then moved to suspend all athletics for 2021-22 (prompting Texas Open Meetings Act
violations and additional Gender Equity concerns that by considering no other options,
reinstatement of only a men's sport and the coach of a men's sport was considered, funded,
and approved for reinstatement. None of the three existing women's sports received equal
consideration; nether of the two existing coaches of women's sports were considered for
reinstatement (promotion).

59. May 11, 2021 Zoom meeting with Dr. Marisela Rodriguez-Tijerina, Dr. David Arreazola, Dr.
Horacio Salinas, and Dr. Fred Solis regarding the May 10th decision. Lansford expressed her
concerns about the academic information presented by Ms. Leven-Ramos. Dr. Rodriguez-
Tijerina told me that the academic information truly didn't matter. She said that the decision

was all about money. Ms. Lansford responded that it may not matter to her, but she is very proud of the academic accomplishments of the students in her program and if they are going to be put on blast, she wanted to make sure they are correct.

60. Lansford later discovered that the data reported by Ms. Leven-Ramos was based on incomplete non-confirmed rosters for each sport and, therefore, inaccurate and/or misleading. combined.

61. Ms. Lansford noted that more significant than the inaccurate academic information, the same data and report were used by the administration to calculate estimated expenditures per athlete and the percentage of local athletes per team and in all programs. Two of the primary reasons provided to the public and board of Trustees by Dr. Rodriguez-Tijerina, and Board President Lupita Zepda were the high cost of expenditures per athlete and the low percentage of local athletes. The estimated cost of attendance was overinflated and skewed by the incomplete and non-confirmed rosters [13 softball athletes alone were confirmed missing from the data and report which greatly skews the data in the small sample size of 47]). Conversely, the reported percentage of local athletes was also skewed (considerably lowered) by the incomplete and unconfirmed rosters and small sample size.

62. Ms. Ramos's PPT presentation also included information defending the Men's Soccer/Women 's Soccer decision stating that the ad hoc committee only had a budget of 230,000 to work with which is inconsistent with the 430,000 presented to the committee weeks before.

63. Ms. Lansford requested a postponement of her originally scheduled meeting with Dean Pena & Veronica Cardenas to discuss gender-equity inequities in the April 29th decision to reinstate Men's Soccer, add Women's Soccer, while leaving the three existing women's sports and two additional existing men's sports to face extended suspension or termination due to the May 10th decision to suspend all athletic programs again for 2021/22.

64. Because of the May 10th decision, Ms. Lansford's concerns had changed from the gender-based inequities of the M&W Soccer decision to increased denial of opportunity (lack of equal consideration) through no action to rectify the inequities in that decision with consideration of equitable alternatives.

65. At the time, Lansford truly believed that the decision to simply suspend everything was reactive and somewhat retaliatory to her initial concern. Ms. Lansford didn't consider the letter she had written on April 29th nor the fact that in order to consider the most obvious option, they would have had to reinstate the coaching position of the person [Coach Lansford] who had twice expressed concerns and/or criticism.

66. May 14, 2021 – Ms. Lansford sent an email to Dr. Rodriguez-Tijerina and Dr. Arreazola with the correct academic information. She received a response from Dr. Rodriguez-Tijerina stating that her spreadsheet included students outside the parameters (years examined). Although she had highlighted those students and did not include them in the original spreadsheet numbers, she removed the students who fell outside of those parameters and sent a revised copy. Dr. Rodriguez-Tijerina neither responded, investigated, nor took accountability for the inaccuracies in the data and report on which the fate of the future of the athletic programs relied.

67. Coach Lansford also raised questions about Ms. Leven-Ramos's claim that no recent students have called or emailed in support of athletics. At the time, all student-athletes were gone due to the first suspension and all instruction was online. Therefore, on the surface, the

statement presented a negative reflection of student interest but was irrelevant given the current student population.

68. Dr. Rodriguez-Tijerina responded with irrelevant answers and seemed to have no understanding of what Lansford meant when she told her that potential student-athletes serious about playing in college, have the ability to make the roster and/or compete at the college level, would not be currently enrolled in an all-online format without an athletic program. Dr. Rodriguez-Tijerina told Lansford that there was no data to support that. Lansford realized that Dr. Rodriguez-Tijerina did not understand or have the desire to understand the recruiting process, or why those student-athletes enroll.

69. Ms. Lansford responded with an article explaining walk-ons, recruited walk-ons (guaranteed roster spot), non-recruited walk-ons (option to try out), and blind walk-ons (appear on campus without coach's knowledge).

70. May 14, 2021, Ad hoc Committee meeting to discuss the decisions made on April 29th Men's Soccer/Women's Soccer decision and the May 10th decision to rescind and suspend.

   a)  Ms. Lansford's Title IX" complaints which occurred within 3 days of the April 29th Men's Soccer/Women's Soccer decision and 4 days prior to the May 10th decision to rescind and continue suspension were never acknowledged nor discussed openly.

   b) As with the "suspicious" timing of the above-mentioned succession of events and Ms. Leven-Ramos' "bolstering after the fact" PPT presentation, Ms. Leven Ramos discussed the April 29th Men's Soccer/Women's Soccer decision and stated that she discovered the next day (April 30th) that there weren't enough resources for decision and that she personally called Coach Ibarra to put recruiting on hold.

   c) Coach Ibarra confirmed with Coach Lansford that he never received that phone call from Ms. Leven-Ramos and that he was allowed and encouraged to recruit and hold tryouts until after the May 10th meeting. Although Ms. Leven-Ramos had contact with Coach Ibarra prior to April 29th, she did not make that call.

   d) Former LC President, Dr. Ricardo Solis, stated that the administration had no intent prior to 2020 to discontinue sports  which could be evidenced by the large investment the school had made in athletic facility upgrades in 2019. (Contradicts pre-textual reason Ms. Lansford was provided for her ultimate termination on 8/31/22 and disbanding of the athletic programs on 3/31/22).

71. On May 22, 2021, Ms. Lansford sent a follow-up email to Ms. Leven-Ramos with the correct academic information and her concerns about her presentation.

72. On May 24, 2021, Coach Lansford forwarded the above information to the remaining board members.

73. On May 25, 2021, Dr. Rodriguez-Tijerina hosted a Zoom meeting with Ms. Lansford, Raquel Pena, Veronica Cardenas, and Dr. David Arreazola to discuss contacting the Board of Trustees.

   a) Dr. Rodriguez-Tijerina warned Lansford that further contact with the board would result in termination.

   b) Lansford complied and was deterred from further expression of her protected First Amendment right through communication with the board of trustees or the media.

   c) Dr. Rodriguez-Tijerina's retaliatory and illegal threat of termination for further engaging in a protected activity created a hostile work environment for Lansford as although she had a plethora of data and evidence that would discount the inaccurate and or misleading

information Dr. Rodriguez-Tejerina continued to present to the board of trustees and the public which, ultimately, caused the board of trustees to disband athletics and not-renew Coach Lansford's, Coach Donjuan's and Coach Ibarra's contracts as the decision was made on Dr. Rodriguez-Tijerina's recommendation and based on the information she provided.

d) Because Dr. Rodriguez-Tijerina took such drastic measures to control the information provided to the board of trustees which they would use to make an informed decision regarding the athletic programs and coaches the board could only make decisions based on the information they were provided. Had Lansford not been threatened with termination and denied her First Amendment right, the board of trustees would have received additional and more complete information from Lansford that she truly believes would have prevented the board of trustees from accepting the retaliatory action and making the decision to disband and not-renew (but, for).

e) In a later meeting with the coaches in February 2022, Lansford adamantly protested the representation of an option for reinstating athletics to the board of trustees in the February meeting because the board had denied the same proposal in November 2022.

f) Contrary to her May 25, 2021, threat of termination, Dr. Rodriguez-Tijerina informed Lansford that although she couldn't legally tell her not to talk to the board members, she wouldn't recommend it as the board had told her that they would not micromanage the administration.

74. On June 8, 2022, Ms. Lansford received notice of the BOT decision to suspend for 2021-22, her continued assignment to HSOC until the board would re-evaluate, and a timeline to appeal from the President.

75. On June 17, 2022, Ms. Lansford submitted the Exhibit A form to Veronica Cardenas as requested.

76. On August 11, 2022, Ms. Lansford received the first investigation report for (FFDA) grievance.

77. August 31, 2021 – Title IX Investigation interview (DIAA) with granted 2-week FMLA extension.

78. September 9, 2021 – Submitted response to initial (FFDA) investigation report with extended gender-equity concerns and TOMA violation allegations. Granted 2-week FMLA extension.

a) Ms. Lansford provided additional details of Title IX violations.

b) Coach Lansford elaborated on violations of the Open Meetings Act → lack of specificity in notices for BOT meetings on April 29th and May 10th

79. September 1, 2021, Ms. Lansford was out on FMLA.

a) Coach Lansford discovered that the 3 coaches received the lowest evaluations in the department, and Lansford received the lowest of all HSOC employees.

b) The evaluation scores were the lowest any of these coaches had ever received

80. October 1, 2021 – Received Notice of Hearing Consolidation.

81. October 15, 2021 – Informal conversation with Dr. Arreazola, Interim Provost/Dean of HSOC

a) Discussed Title IX grievances and solutions.

b) Lansford told him that she was not making complaints for money; she simply wanted the situation to be fixed.

c) Dr. Arreazola as Lansford what she meant by "fixed."

d) Caught off guard, Ms. Lansford replied with:

    i) Placing Ms. Lansford in the vacant Deputy Title IX Coordinator for Athletics position for which she volunteered since her arrival in 2014. Athletics was the only department without a designated Deputy Title IX Coordinator position despite the complex nature of athletics and the recommendation to fill the position on LC's online Title IX Training presentation.

    ii) Involving the coaching staff in future decisions (personnel with experience in athletics).

    iii) Lansford told Dr. Arreazola that the non-response and/or action to remedy my initial Title IX concerns were in many ways worse than the initial decision (Men's Soccer/Women's Soccer.

e) Ms. Lansford and Dr. Arreazola discussed the "temporary" reassigned positions of the coaching staff in HSOC.

    i) Dr. Arreazola stated that he knew from the beginning that the coaches were not interested in this type of work.

    ii) Ms. Lansford told him that it wasn't so much the work---it is the toxic environment in which we work and how we are treated on top of the stress, uncertainty, and non-communication from the administration regarding the future of athletics.

    iii) Dr. Arreazola had received several complaints about the manner in which Javier Cano, HSOC supervisor, treated the employees (all transfers from Athletics and the Child Development Center), especially the coaches.

f) Dr. Arreazola advised Ms. Lansford to continue her grievance process. Although he was the LC Provost, he stated that because he was the Dean of HOSC, he had not been included in the majority of the legal conversations.

    i) Dr. Arreazola told Coach Lansford that he had heard she was very smart and, if nothing else, they had learned a ton about Title IX and the Open Meetings Act.

    ii) Dr. Arreazola also told Coach Lansford that "they" have made comments such as "She [Lansford] developed and presented this information (LC Gender Equity Study & Compliance Plan) in 2019. If we would have paid attention and fixed it back then, we wouldn't be in this mess.

82. On October 22, 2021, Coach Ibarra received a copy of a survey the administration sent to Academic Deans to distribute to current students regarding their willingness to increase the student activity fee. As with the previous conversation regarding "current students and interest in athletics," the 3-5 survey questions were not applicable to the current student population. Obviously, they were going to decline.

a) Coach Donjuan had a heated conversation with Dr. Arreazola regarding the survey.

b) Lansford first learned that funds from the general operating budget were not included in the 2021-22 budget and that all future sports would be under student activity funds in a follow-up conversation with Coach Donjuan.

c) Ms. Lansford called Dr. Arreazola to discuss the matter as she was under the assumption that the General Operating funds for athletics and other sports would be restored in 2022-23. This issue was never discussed publicly in BOT meetings. Two BOT members asked the following question when the ad hoc committee was created but did not, nor have since, received a clear answer, "knowing that the suspension was for one year, why did we not set money aside to plan for that?"

83. October 25, 2021 - Presentation to the Administration by the Coaches. Coaches Lansford, Donjuan, and Ibarra met with Dr. Rodriguez-Tijerina, Dr. Arreazola, Cesar Vela (CFO), and Dr. Fred Solis (VP for Enrollment and Student Success) as scheduled but did not have the opportunity to present the proposal they were requested to provide.
   a) Dr. Rodriguez-Tijerina stopped Coach Lansford on the first slide and said that she didn't need to hear their plan or the value of athletics.
   b) Ms. Lansford asked questions regarding the GO budget again and the large amount of excess funds spent at the end of the 2021 fiscal year. It was made clear that money would not be put back into the GO for athletics (used the same arguments regarding GO she used in March using overinflated projections.
   c) Coach Donjuan asked, "So basically, Tennis is done?" Dr. Rodriguez-Tijerina did not answer directly but the conversation turned to the sustainability of athletics using student activity fees as the only funds that would ever be available.
   d) Dr. Rodriguez-Tijerina falsely blamed the three coaches for always asking for budget increases. Coach Donjuan made it clear that the prior baseball coach and long-time best friend for former Provost, Vincent Solis, was the only coach who made any requests for budget increases.
   e) Coach Donjuan made it clear that the three coaches in the room had never complained about their budgets, had offered suggestions to make cuts in their budgets (no scholarships, recruit only locally, no out-of-season travel, etc.), and were absolutely willing to adjust as needed.
   f) It became obvious that Dr. Rodriguez-Tijerina did not want to hear anything further, that the coaching contracts would expire in August 2022, and that sports would not return in 2022-23.
   g) Mr. Vela stated that the only monies budgeted for athletics in 2021-22 were the coaching salaries.
   h) Coach Donjuan asked about the possibility of the three coaches moving from HSOC to run the gym, sports complex, intramurals, etc. for the remainder of the year because it was apparently going to be their last. Dr. Rodriguez-Tijerina denied that request.
   i) Given that their coaching salaries were included in the 2021-22 budget, Ms. Lansford asked Dr. Rodriguez-Tijerina if there was any possibility that the three coaches at least be able to be paid those salaries due to the financial strain on their families and the fact that it would be their last year. Dr. Rodriguez-Tijerina denied that request.
   j) Approximately 3 hours later, an obviously angry Dr. Rodriguez-Tijerina amended the agenda (her agenda item) for the upcoming board meeting from "feasibility and sustainability of the Laredo College athletics program, including a possible change to the current status of the program" to "discussions related to the feasibility and sustainability of the Laredo College athletics program, the possible disbanding of the athletics program, and the personnel employed in the athletics program.

84. In her presentation to the board in support of disbanding athletics in the October board meeting, Dr. Rodriguez-Tijerina included "no Title IX issues or implications." as one of her 5 primary bullet point rationales. (Answers the question, would she or they really disband an entire program because of Ms. Lansford's Title IX complaints?).
   a) Dr. Tijerina's proposal to disband athletics failed.

85. On October 29, 2021, George Russell Meurer issued a Title IX Investigation Report (DIAA – LOCAL)

86. November 16, 2021, Ms. Lansford provided Laredo College w/ her response to the Title IX Investigation Report (DIAA – LOCAL)

87. December 14, 2021, the Laredo College Board of Trustees voted to reinstate some of the Athletics Program
    a) LC BOT charged LC Administration to construct a plan.

88. December 15, 2021, Coaches met with Dr. Arreazola (was supposed to include but did not include Dr. Rodriguez-Tijerina)

89. December 15, 2021, Lansford amended her pending complaint(s) to include allegations against Dr. Rodriguez-Tijerina
    a) This included providing false or manipulated information to BOT
    b) Lansford also raised issues of sex and age discrimination and retaliation for opposing discrimination.

90. January 31, 2022, Lansford provided additional documents to George Russell Meurer in support of her complaints.

91. February 1, 2022, Lansford sent an e-mail to George Russell Meurer
    a) Ms. Lansford pointed out coaches were treated differently than employees of Camilo Prada during the suspension of both programs.
    b) Ms. Lansford detailed differences in the Surveys used by LC Administration to support reinstating Camilo Prada and eliminating athletics.
    c) Directors of Camilo Prada that retained salaries created surveys distributed to students to measure reinstatement or non-support.
    d) Coaches had no input and found out after the fact.

92. February 9, 2022, Coaches Lansford, Donjuan, and Ibarra met with Dr. Rodriguez-Tijerina, Dr. Arreazola, Dr. Fred Solis, and Cesar Vela.
    a) The coaches presented a plan within the confines of the budget allotted.
    b) Dr. Rodriguez-Tijerina admitted GOF funds for the 2020-21 academic year were spent by LC Administration on new programs.
    c) Dr. Rodriguez-Tijerina announced that LC Administration would present Option #2, which had already been rejected by BOT (December 2021)
        i) Option #2 = reinstate Men's and Women's Tennis, Women's Softball, and Men's Soccer requiring $764,988
    d) Dr. Rodriguez-Tijerina assured the coaches that she would support them and the proposal with agreed-upon modifications at the board meeting.

93. February 24, 2022, BOT Meeting → LC Administration only proposed Option #2 (out of 3 options available)
    a) Dr, Rodriguez-Tijerina failed to support the proposal or the. coaches as promised.
    b) BOT rejected Option #2
    c) The only viable option to be in compliance with Title IX would be to reinstate Softball because of larger participation to meet participation requirements, but this option would include retaining Lansford.

94. February 25, 2022, Lansford provided additional information to Laredo College in support of her claims of discrimination and retaliation against Dr. Rodriguez-Tijerina.

95. February 27, 2022, Coaches met with Dr. Rodriguez-Tijerina, Dr. Arreazola, Dr. Fred Solis, and Cesar Vela
   a) Lansford questioned intentional sabotage of the sustainability of the Athletics Program by moving Student Activities-funded programs to GOF and keeping all sports under the more volatile. SA budget.

96. March 1, 2022, Lansford disclosed her OCR complaint to Laredo College during a meeting with Dr. Arreazola. Ms. Lansford and Dr. Arreazola also discussed the meaning of her Title IX allegation of the "perpetuation of a gender stereotype" through the automatic assumption that a male coach is qualified to coach both men's and women's programs, but female coaches are only qualified to coach women's programs.
   a) Lansford filed her Title IX complaint w/ OCR on February 10, 2022

97. March 25, 2022, Lansford communicated w/ Dr. Arreazola via text messages regarding inconsistencies in reported funds available for the Athletics Program for the 2021-22 academic year.
   a) Ad Hoc Committee given $430,000 budget,
   b) BUT, the presentation by Ms. Leven-Ramos on May 10, 2021, only had funds of $230,000.

98. March 28, 2022, Lansford communicated with Dr. Arreazola via e-mail regarding March 25th text messages.
   a) Asked what happened to SA revenue from 20-21 fees.
   b) Lansford no longer had access to her LC e-mail account.

99. March 31, 2022, LC BOT voted to disband the Athletics Program
   a) NO communication between coaches and LC Administration on what would be proposed
   b) Added E-Sports
   c) The decision to disband the Athletic Program was made by LC Administration when it decided to exclude athletics from the GOF.
   d) BOT voted to non-renew Lansford.
   e) As with former instances with items of high public interest, specifically athletics, the specificity in the agenda item was vague at best.

100. April 1, 2022, Lansford received notice of non-renewal and was placed on immediate administrative leave.
   a) Coach Donjuan and Coach Ibarra were escorted to their offices to pack and return their keys.
   b) Lansford only allowed supervised visits to retrieve her personal belongings.

101. April 11, 2022, Lansford filed her DGBA complaint.
   a) Alleged retaliation against by Dr. Rodriguez-Tijerina, BOT, and LC Administration for filing complaints with Laredo College and OCR

102. April 11, 2022, Lansford sent an e-mail to Dean Pena and Veronica Cardenas.
   a) Notified that Lansford would file an appeal on May 31, 2022, to challenge BOT's decision to disband existing sports and create E-Sports
   b) E-Sports was not an existing sports program.
   c) E-Sports had not been defined/recognized by governing board.
   d) E-Sports participants are predominantly male.

e) Within one week of adding E-Sports, Dr. Rodriguez-Tijerina immediately reassigned a male employee with no experience in athletics as the Dean of Athletics.

103. May 16, 2022, Lansford re-filed her April 11th DGBA complaint under DIAB, as instructed by HR (Ms. Cardenas)
   a) Alleged discrimination, harassment, and retaliation resulting in disbanding athletics and non-renewal.

104. May 19, 2022, BOT Meeting
   a) Proposal made to reinstate Men's Soccer, Men's and Women's Tennis, and Volleyball
   b) If passed, it would have allowed both male coaches to retain their jobs (but not Lansford) and hire a new volleyball coach.
   c) If the proposal would have passed, LC would have remained out of compliance with Title IX participation opportunity requirements.
   d) The board member who made the proposal demonstrated available funds to implement the programs.
   e) Prior to voting on the proposal, Jackie Leven-Ramos stated that "she could only vote one way. If she were to vote the opposite way [to approve the proposal], she would be demonstrating a vote of confidence in the current administration [Dr. Rodriguezs-Tijerina].

105. On June 7, 2022, Celina Vinson was hired by Laredo College to conduct virtual interviews of Lansford, Dr. Rodriguez-Tijerina, Cesar Vela, and Dr. Arreazola regarding her DIAB complaint.
   a) Coach Ibarra also filed an appeal of the non-renewal decision based on retaliation for opposing administrative procedures during the nearly 2-year process (now as a group), and was also interviewed by Ms. Vinson, but withdrew his appeal.

106. June 15, 2021, Lansford received an email from Danielle Martinez, Mr. Meurer's partner, requesting a meeting with Mr. Muerer and Ms. Martinez on Jun 17. In her reply to Ms. Martinez, Ms. Lansford informed Ms. Martinez that she was no longer comfortable speaking with Mr. Muerer because she felt bullied and "cross-examined" as a witness in a trial in their last conversation. Ms. Lansford received a call from Ms. Martinez better understand Ms. Lansford's reluctance to speak with Mr. Muerer. At the end of the conversation, Ms. Lansford agreed to meet with both Mr. Meuer and Ms. Martinez on June 17th.

107. June 17, 2022, Mr. Meurer and Ms. Martinez conducted a telephone interview with Ms. Lansford
   a) Mr. Muerer asked Ms. Lansford to explain her reluctance to talk to him.
   b) Ms. Lansford explained that in their last conversation, she felt bullied and "cross-examined" like a witness by Mr. Muerer.
   c) Ms. Lansford also told Mr. Muerer that she felt that his investigation of her Title IX complaints was one-sided due to his inherent bias as the school's attorney.
   d) Ms. Lansford provided several examples of instances when Mr. Meurer acted as the school's attorney rather than a "neutral" investigator throughout the far too extended investigation process.

      i)  Ms. Lansford pointed out that according to the Title IX training program on the LC website clearly states that the school's attorney should not assume the investigator role.

108. July 1, 2022, Lansford received Celina Vinson's Investigation Report (issued to Laredo College on June 28, 2022)
   a) Ms. Vinson's report demonstrated that Lansford undisputedly engaged in protected activity and suffered an adverse employment action.
   b) Ms. Lansford's TTCA Attorney, Michael Kim was about to demonstrate causation through the McDonell Douglass framework.
   c) Ms. Lansford noticed several false and/or misleading statements in the interview transcripts of Dr. Rodriguez-Tijerina, and Cesar Vela.
   d) Ms. Lansford also found that Dr. Arreazola denied knowing about Ms, Lansford's OCR claim.
   e) Ms. Lansford sent a text to Dr. Arreazola to set up a time to chat in his office. Dr. Arreazola agreed to meet with Ms, Lansford on July 13, 2022.
109. On July 13, 2022, Dr. Arreazola informed Coach Lansford that he had been advised that he could not speak with her.
110. July 18, 2022, Ms. Lansford filed an appeal of results from Celina Vinson's Investigation.
111. August 29, 2022, Ms. Lansford received the Final Title IX Decision.
   a) Decision made by school-hired consultant Scott Lewis
   b) Ms. Lansford advised Dean Pena and Veronica Cardenas that she planned to appeal the decision based on Mr. Meruer's inherent bias as the investigator, the delay in response from Dr. Rodriguez-Tijerina's attorney (almost three months [10-day requirement]), and excessive delay in the completion of the investigation.
   c) Dean Pena advised Lansford that Laredo College's dismissal of her 2 Title IX complaints filed in May 2021 and June 2021 was final.
   d) Lansford neither received the required hearing nor the opportunity to appeal.
112. November 4, 2022, Non-renewal Grievance Hearing with Board of Trustees.
   a) Lansford's TTCA attorney demonstrated retaliation through the McDonell Douglass framework.
   b) Laredo College's attorney would neither address the timeline, discrimination, nor retaliation.
   c) Laredo College's attorney relied solely on surface-level/biased investigation conducted by LC-hired investigator, Celina Vinson
      i)  Asserted that it was a simple business decision related to a 2017 lengthy presentation given to the board by a financial consultant.
      ii) The minutes of the 2017 board meeting only read that a financial consultant had been on campus for half of a day.
      iii) The Board of Trustees took no action.

IV. STATEMENT OF CLAIMS

CLAIM ONE – GENDER/SEX DISCRIMINATION, AND HOSTILE WORK ENVIRONMENT, BASED ON
SEX/GENDER, IN VIOLATION OF TITLE VII
(Against Former LC Interim President/former and current Provost, Dr. Marisela Rodriguez-
Tijerina, Board member and former Chair of the ad hoc Committee, Jackie Leven-Ramos in their
official capacity only)

119. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.
120. The conduct of Defendants, and their agents, as set forth above, constitutes unlawful
discrimination against Plaintiff on the basis of sex, in violation of Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e et seq., and is part of Defendants' pattern and practice of
discrimination, and exclusion, on the basis of sex. Plaintiff was denied a work environment
free of discrimination in violation of 42 U.S.C. § 2000e et seq as amended, 42 U.S.C.
§1981(a), and was denied equal opportunity in the terms and conditions of his employment.
121. Defendants' harassment of Plaintiff on the basis of sex was of a severe or pervasive nature
such as to create an abusive and hostile work environment for Plaintiff that altered the
conditions of her employment.
122. Defendants' acts were with malice and reckless disregard for Plaintiff's federally protected
rights.
123. As a result of the said acts of Defendants, Plaintiff has been injured and damaged as follows:
She has suffered emotional trauma and humiliation; she has suffered mental pain and
anguish; she has incurred expenses in an attempt to enforce his legal rights; she has suffered
the loss of income; she has been offended by Defendants' discriminatory actions; she was
denied the benefit of working in an environment in which people of all genders, races, and
colors, are treated equally; she was demoted and her salary was been reduced, she has
been denied pay raises and benefits, and she was transferred to a less prestigious position,
her career interrupted, and she has been otherwise discriminated against in the terms and
conditions of her employment; she has been denied the opportunity to continue or advance
in her career and she has suffered corresponding economic; all in violation of his federally
protected rights; and she has been otherwise injured and damaged.

CLAIM TWO - RETALIATION UNDER TITLE VII (against Laredo College, Dr. Rodriguez-Tijerina, and
Jackie Leven-Ramos in their official capacity only)

125. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.
126. Defendants retaliated against Plaintiff, and do so as part of a pattern and practice of
retaliation because she opposed Defendant's discriminatory practices because she
initiated a proceeding and investigation relating to Title VII because she filed an EEOC
charge and for other related reasons in violations of the Civil Rights Act of 1964,42 U.S.C.
§2000e e"se
127. As a result of the said acts of Defendants, Plaintiff has been injured and damaged as
follows: She has suffered emotional trauma and humiliation; she has suffered mental pain
and anguish; she has incurred expenses in an attempt to enforce her legal rights; she has
suffered loss of income; she has been offended by Defendants' discriminatory actions; she

was denied the benefit of working in an environment in which people of all both genders, are treated equally; she was demoted and her salary was reduced, she was denied earned pay raises and benefits, and she was transferred to a less prestigious position, ultimately terminated, her career interrupted, her coaching career ended 10 years early, and she has been otherwise discriminated against in the terms and conditions of her employment; she has been denied the opportunity to advance in her career and she has suffered corresponding economic damages; she was forced to work in an environment hostile to strong females, one in which harassment based on gender was directed toward her; all in violation of her federally protected rights; and she has been otherwise injured and damaged.

CLAIM THREE - GENDER DISCRIMINATION IN VIOLATION OF TITLE VII (Against Laredo College)

128. Plaintiff adopts and realleges the above paragraphs as though fully set forth herein.
129. Defendant College is the former employer and Lansford was an employee within the meaning of Title VII.
130. Defendants treated Plaintiff less favorably than her similarly situated male counterparts because of her sex in the male-dominated profession of college athletics. Defendant College views Plaintiff's sex as inconsistent with acceptable gender roles in which many tasks and traits are associated with male coaches or "manliness,"
131. Plaintiff's gender, female, and the stereotypes associated with being female, were motivating factors in Defendants' subjecting Plaintiff to discrimination and taking the adverse actions of demoting, not considering her for reinstatement to her coaching position and associated higher pay and otherwise discriminating against her in the terms and conditions of her employment.
132. As a result of the said acts of Defendants, Plaintiff has been injured and damaged as follows: She has suffered emotional trauma and humiliation; she has suffered mental pain and anguish; she has incurred expenses in an attempt to enforce his legal rights; she has suffered loss of income; she has been offended by Defendants' discriminatory actions; she was denied the benefit of working in an environment in which people of both genders, are treated equally; she was demoted and her salary was reduced, she was denied earned pay raises and benefits, and she was transferred to a less prestigious position, ultimately terminated, her career interrupted, her coaching career ended 10 years prematurely, and she has been otherwise discriminated against in the terms and conditions of her employment; she has been denied the opportunity to advance in her career and she has suffered corresponding economic damages; she was forced to work in an environment hostile to strong females, one in which harassment based on gender was directed toward her; all in violation of her federally protected rights; and she has been otherwise injured and damaged.

CLAIM FOUR- VIOLATION OF 42 U.S.C. § § 1981,1981a, 1983 (Discrimination, Retaliation, and Hostile Work Environment based on Sex and Protected Activity)

133. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

134. Plaintiff is a member of a class protected by 42 U.S.C. §1981 and is qualified for employment with the College.

135. The conduct of Defendants, its agents, and employees, constitutes unlawful discrimination and retaliation against Plaintiff on the basis of sex, in violation of 42 U.S.C. § 1981 and 1983, and constitutes part of Defendants' pattern and practice of retaliation and discrimination on the basis of sex.

136. Defendants' harassment of Plaintiff on the basis of sex was of a severe or pervasive nature such as to create an abusive and hostile work environment for Plaintiff that altered the conditions of her employment.

137. Defendants' acts were with malice and reckless disregard for Plaintiff's federally protected rights.

138. As a result of the said acts of Defendants, Plaintiff has been injured and damaged as follows: She has suffered emotional trauma and humiliation; she has suffered mental pain and anguish; he has incurred expenses in an attempt to enforce her legal rights; she has suffered loss of income; she has been offended by Defendants' discriminatory actions; she was denied the benefit of working in an environment in which people of all both genders, are treated equally; she was demoted and her salary was reduced, she was denied earned pay raises and benefits, and she was transferred to a less prestigious position, ultimately terminated, her career interrupted, her coaching career ended 10 years early, and she has been otherwise discriminated against in the terms and conditions of her employment; she has been denied the opportunity to advance in her career and she has suffered corresponding economic damages; she was forced to work in an environment hostile to strong females, one in which harassment based on gender was directed toward her; all in violation of her federally protected rights; and she has been otherwise injured and damaged.

139. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of employment, loss of promotion opportunities, loss of income, loss of other employment benefits, mental and emotional distress, humiliation, loss of self-esteem, depression expense, embarrassment, and damage to her reputation.

CLAIM FIVE - EQUAL PROTECTION
(Against LC and Dr. Marisela Rodriguez-Tijerina, and George Russell Meurer)

140. Plaintiff adopts and realleges all of the above paragraphs as if set out in full.

141. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to remedy and redress the violation of his Fourteenth Amendment right to equal protection based upon the failure to confer upon her the rights and work environment of similarly situated male employees of the College because of her gender.

142. Defendants have at all times acted under the color of statutes, ordinances, regulations, and/or customs of the State of Texas. Defendants have established and are maintaining a policy and custom of depriving Plaintiff, a female of her rights secured by the United States Constitution and federal law. Defendants Rodriguez-Tijerina and Leven-Ramos have been personally involved by engaging in specific acts and/or approving of wrongful conduct that

has deprived Plaintiff of her federal rights. Defendants' knowledge, or endorsement, promotion., ratification, or encouragement of, and acquiescence in, unlawful conduct, has deprived Plaintiff of her constitutional and statutory rights. Defendants have devised a plan or scheme to deprive Plaintiff of her constitutional and statutory rights and have retaliated against her for exercising such rights.

143. The policies, practices, and customs of Defendants substantially burden the rights of females in male-dominated professions.

144. Lansford has been subjected to a hostile environment because of her sex.

145. The defendants' actions have been motivated by invidious strong female animosity that is supported by no rational or legitimate governmental interest. The above-mentioned acts of Defendants were willful, wanton, malicious, and oppressive, and justify the award of punitive damages and all other damages outlined herein.

146. As a result of said acts, Plaintiff has been injured and damaged as follows: She has been retaliated against and discriminated against on the basis of her gender; she has suffered emotional trauma and humiliation; she has suffered mental pain and anguish; she has incurred expenses in an attempt to enforce her legal rights; she has suffered loss of income; she has been offended by Defendants' retaliatory and discriminatory actions; she was demoted and her salary was reduced, she was denied earned pay raises and benefits, and she was  transferred to a less prestigious position, ultimately terminated, her career interrupted, her coaching career ended 10 years early, and she has been otherwise discriminated against in the terms and conditions of her employment; she has been denied the opportunity to advance in her career and she has suffered corresponding economic 26 damages; she was forced to work in an environment hostile to strong females, one in which harassment based on biased gender stereotypes, was directed toward her; all in violation of her federally protected rights; and she has been otherwise injured and damaged. all in violation of his federally protected rights; and he has been otherwise injured and damaged.

CLAIM SIX - VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS (Speech and Petition under 42 U.S.C. §1983)
(Against LC and Dr. Marisela Rodriguez-Tijerina, and George Russell Meurer)

147. Plaintiff adopts and realleges the above paragraphs as if set out in full.

148. Defendants Dr. Rodriguez-Tijerina, Leven-Ramos, and Meurer, acting under color of State Law, have discriminated, and retaliated against Plaintiff because she exercised her right to free speech and to petition the government for redress under the First and Fourteenth Amendments to the U.S. Constitution by basing their decisions to an impermissible extent on Ms. Lansford's exercise of her free speech and petition rights.

149. Coach Lansford has raised serious matters of public concern, specifically the history and continued systemic screening and selection of candidates for coaching positions based primarily or entirely on impermissible considerations, rather than relative qualifications for the positions to be filled. Coach Lansford has spoken out against those practices on legal, moral, and practical grounds.

150. Defendants retaliated against Coach Lansford because of her exercise of her free speech and petition rights.

151. As a result of the said acts of Defendants, Plaintiff has been injured and damaged as follows: She has suffered emotional trauma and humiliation; she has suffered mental pain and anguish; she has incurred expenses in an attempt to enforce her legal rights; she has suffered loss of income; she has been offended by Defendants' retaliatory and discriminatory actions; she was demoted and her salary was reduced, she was denied earned pay raises and benefits, and she was transferred to a less prestigious position, ultimately terminated, her career interrupted, her coaching career ended 10 years early, and she has been otherwise discriminated against in the terms and conditions of her employment; she has been denied the opportunity to advance in her career and she has suffered corresponding economic damages; she was forced to work in an environment hostile to strong females, one in which harassment based on biased gender stereotypes, was directed toward her; all in violation of her federally protected rights; and she has been otherwise injured and damaged. all in violation of his federally protected rights; and he has been otherwise injured and damaged.

CLAIM SEVEN - DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE IX OF THE 1972 EDUCATION AMENDMENTS (against LC and Dr. Marisela Rodriguez-Tijerina)

152. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.
153. Defendant College receives federal assistance and therefore must comply with Title IX of the Education Amendments of 1972, at 20 U.S.C. § 1681, et seq ("Title IX"), which prohibits gender discrimination in any education program or activity receiving federal financial assistance; Title 34 of the Code of Federal Regulations, section 100.7, which prohibits retaliation against people who assert a right protected by Title IX; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq ("Title VH"), which prohibits gender discrimination in an employment set Sing and retaliation for complaints about discrimination.
154. Plaintiff complained to the College and agents and/or employees of the College about what they reasonably and in good faith believed to be gender inequities in the treatment of coaches and athletes who participate in sports at the College. as set forth herein.
155. Following these complaints, the College subjected Plaintiff to retaliation. The retaliatory acts included, but were not limited to, subjecting Plaintiff to less favorable treatment than her similarly situated male counterparts by demoting and transferring her to what was supposed to be a "temporary" less prestigious position. and by reducing her salary and otherwise discriminating and retaliating against her in the terms and conditions of employment.
156. Coach Lanford's complaints about gender inequities at the College were a motivating factor in the decision to take adverse action against her. Defendant's discriminatory and retaliatory conduct was a substantial factor causing Plaintiff to suffer harm, including career interruption, emotional distress, and economic loss.

CLAIM EIGHT—DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (against LC)

157. Plaintiff adopts and realleges the above paragraphs as if set out in full herein

158. Defendant College receives federal assistance and therefore must comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq.. ("Title VI"), Which prohibits sex discrimination, and prohibits exclusion from participation and denial of benefits, in any program or activity receiving federal financial assistance; and which prohibits retaliation against people who assert a right protected by Title VI.

159. Plaintiff complained to the College and agents and/or employees of the College about what she reasonably and in good faith believed to be gender inequities in the treatment of coaches and student-athletes at the College, as set forth herein.

160. Following these complaints, the College subjected Plaintiff to retaliation. The retaliatory acts included, but were not limited to, subjecting Plaintiff to less favorable treatment than her similarly situated male counterparts by demoting and transferring Plaintiff to a less prestigious "temporary position, reducing her salary, and only considering her male counterparts for reinstatement to their coaching positions and associated higher salaries and otherwise discriminating and retaliating against her in the terms and conditions of employment.

161. Coach Lansford's complaints about gender inequities at the College were a motivating factor in the decision to take adverse action against her. Defendant's discriminatory and retaliatory conduct was a substantial factor causing Plaintiff to suffer harm, including career interruption, emotional distress and economic loss.


CLAIM NINE - CLASS CONSPIRACY (42 U.S.C. § 1985)
(Against Laredo College, Dr. Rodriguez-Tijerina, Jackie Leven-Ramos and et.al defendants in their official capacity only)

162. Plaintiff adopts and realleges the above paragraphs as if set out in full herein.

163. Plaintiff was discriminated against on the basis of gender as a result of a conspiracy between the Defendants and others in violation of 42 U.S.C. § 1985. Each of the Defendants and others have conspired and agreed between themselves for the purpose of depriving, either directly or indirectly, Plaintiff and others, of the equal protection of the laws or of equal privileges and immunities under the laws, With the intent to deny Plaintiff the equal protection of the laws or to injure Plaintiff, and have conspired and agreed to inflict such discrimination, retaliation and harassment upon her. Each individual Defendant has taken an act in furtherance of the conspiracy and Plaintiff and others have been injured in their persons and property, and have been deprived of rights and privileges secured to citizens of the United States.

164. Defendants reached an understanding, engaged in a sequence of events or course of conduct, and otherwise agreed and conspired together to violate the rights of Plaintiff on the bases of her gender.

165. These Defendants did reach this understanding and agreement, and did engage in this course of conduct with the mutual purpose, objective, and knowledge that it would

deprive Plaintiff of his rights, privileges, and immunities as guaranteed by the laws of the United States, and by the Fourteenth Amendment to the United States Constitution.

166. Acting in furtherance of this plan and conspiracy, the Defendants did commit overt acts, including but not limited to the use of gender discrimination; the creation of a hostile work environment based on gender; the refusal to take action to stop the discriminatory, retaliatory, and harassing conduct; the discriminatory alteration of the terms and conditions of Plaintiff's employment; and to otherwise harass, discriminate and retaliate against Plaintiff in the terms and conditions of her employment.

167. As a result of the said acts of Defendants, Plaintiff has been injured and damaged as follows: She has suffered emotional trauma and humiliation; she has suffered mental pain and anguish; she has incurred expenses in an attempt to enforce her legal rights; she has suffered loss of income; she has been offended by Defendants' discriminatory actions; she was denied the benefit of working in an environment in which people of both genders are treated equally; she has suffered mental pain and anguish; she has incurred expenses in an attempt to enforce her legal rights; she has suffered loss of income; she has been offended by Defendants' retaliatory and discriminatory actions; she was demoted and her salary was reduced, she was denied earned pay raises and benefits, and she was transferred to a less prestigious position, ultimately terminated, her career interrupted, her coaching career ended 10 years prematurely, and she has been otherwise discriminated against in the terms and conditions of her employment; she has been denied the opportunity to advance in her career and she has suffered corresponding economic damages; she was forced to work in an environment hostile to strong females, one in which harassment based on biased gender stereotypes, was directed toward her; all in violation of her federally protected rights; and she has been otherwise injured and damaged. all in violation of his federally protected rights; and he has been otherwise injured and damaged.

CLAIM TEN – ACTION FOR NEGLECT TO PREVENT42 U.S.C. § 1986
(Against Laredo College, Dr. Rodriguez-Tijerina, George Russell Meurer, and et.al defendants in their official capacity only)

168. Individual Defendants Rodriguez-Tijerina, Leven-Ramos, and Meurer had knowledge at all material times that the wrongs conspired to be done as alleged in Claim Eight were about to be or were in the process of being committed during all relevant times through the date of this complaint. Said Defendants had the power to prevent or aid in preventing the commission of these wrongs; yet, they have neglected and refused to do so.

169. Defendant College could have by reasonable diligence prevented the wrongs alleged in Claim Eight by reinstating Plaintiff to her former position and salary in Athletics, or by granting Plaintiff some other effective remedy to redress the deprivation of her rights.

170. Plaintiff is entitled, by virtue of 42 U.S.C. §1986, to recover from the Defendants who have neglected or refused to prevent the wrongful acts alleged all damages resulting from such wrongful neglect or refusal.

### CLAIM THIRTEEN - NEGLIGENT TRAINING AND SUPERVISION
(Against Laredo College, Dr. Rodriguez-Tijerina, and et.al defendants in their official capacity only)

171. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.
172. This is a claim arising under the laws of the State of Texas claiming that Defendants committed the tort of negligent training and supervision.
173. The conduct of the Defendants College and Rodriguez-Tijerina and Leven-Ramos as set forth above was a breach of the Defendants' duty to Plaintiff to exercise care in training and supervising employees. Rodriguez-Tijerina and Leven-Ramos, and others and a breach of Defendant Rodriguez-Tijerina's duty to exercise care in training and supervising Lansford, and such breach proximately caused Plaintiff to suffer humiliation, mental pain and anguish, and loss of income.
174. The above-mentioned acts of said Defendants were willful, wanton, malicious, and oppressive and justify the award of punitive damages.

### CLAIM FOURTEEN - NEGLIGENT RETENTION
(Against Laredo College, Dr. Rodriguez-Tijerina, and et.al defendants in their official capacity only)

175. Plaintiff adopts and realleges the above paragraphs as if set out fully herein.
176. This is a claim arising under the laws of the State of Texas claiming that Defendants committed the tort of negligence.
177. Defendants, by their actions and omissions, breached the standard of care owed to Plaintiff as an employee of Defendant. The conduct of Defendants, as set forth herein, was a breach of Defendants' duty to Plaintiff to exercise due care.
178. Defendant College's breach, through its agents, was the actual and proximate cause of Plaintiff's injuries and justify an award of damages as outlined herein.

### CLAIM FOURTEEN – NEGLIGENCE
(Against Laredo College, Dr. Rodriguez-Tijerina, George Russell Meurer, and et.al defendants in their official capacity only)

179. Plaintiff adopts and realleges the above paragraphs as if set out fully herein.
180. This is a claim arising under the laws of the State of Texas claiming that Defendants committed the tort of negligence.
181. Defendants, by their actions and omissions, breached the standard of care owed to Plaintiff as an employee of Defendant. The conduct of Defendants, as set forth herein, was a breach of Defendants' duty to Plaintiff to exercise due care.
182. Defendant College's breach, through its agents, was the actual and proximate cause of Plaintiffs injuries and justify an award of damages as outlined herein.

### CLAIM SIXTEEN – WANTONNESS
(Against Laredo College, Dr. Rodriguez-Tijerina, George Russell Meurer, and et.al defendants in their official capacity only)

183. Plaintiff adopts and realleges the above paragraphs as if set out fully herein.
184. This is a claim arising under the laws of the State of Texas claiming that Defendants committed the tort of negligence.
185. Defendants, by their actions and omissions, breached the standard of care owed to Plaintiff as an employee of Defendant. The conduct of Defendants, as set forth herein, was a breach of Defendants' duty to Plaintiff to exercise due care.
186. Defendant College's breach, through its agents, was the actual and proximate cause of Plaintiff's injuries and justify an award of damages as outlined herein.

CLAIM SEVENTEEN - BREACH OF CONTRACT AND FRAUDULENT INDUCEMENT TO ENTER CONTRACT (against the College)

187. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.
188. 184 Defendant's transfer of Plaintiff; the reduction of her pay, and the failure to provide Plaintiff with an institutional remedy for the violation of her rights constitutes a breach of Plaintiff's contract of employment.
189. As a result of the breach of Plaintiff's contract, Defendant has damaged Plaintiff, as alleged. She has lost pay and her career has been interrupted and, most-likely ended 10 years prematurely.
190. In connection with the breach of Plaintiff's contract of employment, Defendant failed to act in a commercially reasonable manlier and failed to perform its contractual obligations in good faith.
191. Defendants committed fraud upon Plaintiff by inducing her to accept Defendant's decision to transfer her by falsely representing that she would return to her coaching position and association salary increase following a 6–12-month period in the temporary position.
192. Plaintiff was transferred to a position for which she was vastly over-qualified, for which his advanced education and experience was unnecessary, and which interrupted and derailed her career. Further, her compensation was greatly reduced.
193. Plaintiff reasonably relied to her detriment upon the promises and representations made to her prior to her reassignment.

CLAIM EIGHTEEN – DISPARATE TREATMENT IN VIOLATION OF TITLE IX OF THE 1972 EDUCATION AMENDMENTS (against the College)

CLAIM NINETEEN – DISPARATE IMPACT IN VIOLATION OF TITLE IX OF THE 1972 EDUCATION AMENDMENTS (against the College)

CLAIM TWENTY – DISPARATE IMPACT IN VIOLATION OF IN VIOLATION OF TITLE VII (against the College)

CLAIM TWENTY-ONE – RETALIATION IN VIOLATION TITLE IX OF THE 1972 EDUCATION AMENDMENTS (against the College)

CLAIM TWENTY-ONE – DISCRIMINATORY EMPLOYMENT PRACTICE

CLAIM TWENTY-TWO – FALSE, PRETEXTUAL EXPLANATIONS
(Against Laredo College, Dr. Rodriguez-Tijerina, and Jackie Leven-Ramos in their official capacity only)

CLAIM TWENTY-THREE – BOLSTERING AFTER THE FACT (Against Laredo College, Dr. Rodriguez-Tijerina, and Jackie Leven-Ramos in their official capacity only)

CLAIM TWENTY-FOUR – FAILURE TO FOLLOW POLICIES (Against Laredo College, Dr. Rodriguez-Tijerina, George Rusty Meurer, et.al defendants, and Jackie Leven-Ramos in their official capacity only)

CLAIM TWENTY-FIVE – SUSPECT TIMING
(Against Laredo College, Dr. Rodriguez-Tijerina, George Russell Meurer, Jackie Leven-Ramos, and, et.al defendants in their official capacity only)

CLAIM TWENTY-SIX – ABUSE OF PROCESS
(Against Laredo College, Dr. Rodriguez-Tijerina, George Russell Meurer, and et.al defendants in their official capacity only)

CLAIM TWENTY-SEVEN – LACK OF DOCUMENTATION
(Against Laredo College, Dr. Rodriguez-Tijerina, and et.al defendants in their official capacity only)

SUMMARY

Plaintiff prays upon the court for a monetary liability and punitive damages judgement against named defendants and et .al, defendants to the extent of their liability. Plaintiff suffered total loss of career opportunities and loss of income. Plaintiff further requests the court to appoint legal counsel as needed because part time income combined with meager unemployment still leaves her at the poverty index level. Costs for loss and remuneration for legal representation have not been determined. Estimated damages will exceed one million U.S. dollars.